IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 2, 2017

IN RE M.E.N.J., ET AL.

Appeal from the Juvenile Court for Knox County
No. 160106      Timothy E. Irwin, Judge

No. E2017-01074-COA-R3-PT

This is a termination of parental rights case. The Department of Children's Services filed a petition to terminate the parental rights of M.L.D.N. (mother) with respect to her first-born child, M.E.N.J. While that petition was pending, mother had a second child. The guardian ad litem for the two children later filed a petition to terminate the parental rights of mother with respect to her second-born child, M.A.L.D.[1] The trial court found clear and convincing evidence supporting the termination of mother's rights with respect to both children based on three grounds. The court found (1) substantial noncompliance with a permanency plan; (2) persistence of conditions that led to removal of the children; and (3) failure to manifest an ability and willingness to personally assume custody or financial responsibility of the children. The trial court also found clear and convincing evidence that termination is in the best interest of the children. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, M.L.D.N.

---

[1] The children have different fathers. The rights of the fathers were terminated in previous proceedings. They are not before us in this appeal.

1

Herbert H. Slatery, III, Attorney General and Reporter, and Michael C. Polovich, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

M.E.N.J. was taken into custody on the motion of DCS. The trial court found that M.E.N.J.'s safety could not be ensured while mother was living with a female friend of hers. The children's case worker testified that mother's friend had an extensive history with DCS. The friend's parental rights with respect to two children had previously been terminated. Mother was warned by DCS that M.E.N.J. would likely be taken from her if she could not make other housing arrangements. Despite this warning, mother failed to make other arrangements.

The permanency plan with respect to M.E.N.J. was developed with mother's participation. There were numerous requirements. The plan required that mother: (1) obtain and maintain safe, clean, stable housing free from environmental hazards, domestic violence, drug abuse, illegal activity, or other risks to the child; (2) complete a mental health assessment and follow all resulting recommendations (based in part on mother's bipolar disorder for which she was not taking medication due to being pregnant); (3) finish domestic violence classes for victims; (4) submit to random drug screens and, upon failing a drug screen, complete an alcohol and drug assessment; (5) openly and honestly disclose her history of substance use, and follow any resulting recommendations until successfully finishing same; (6) refrain from associating with drug users or dealers; (7) pass random drug screens to demonstrate sobriety (based in part on mother's admission of previous cocaine use); (8) resolve her then-pending criminal charges for shoplifting and avoid further charges; (9) participate in therapeutic visitation to develop parenting skills and an understanding of the impact of domestic violence on children; (10) visit regularly; (11) obtain a stable source of legal income by completing several job applications per week and obtaining employment for at least four months; (12) obtain and maintain a reliable source of transportation, including public or third-party transportation; (13) pay child support; (14) cooperate with court orders, DCS, and other officials; and (15) maintain contact with the child's case manager. Although this plan has been periodically updated, most of the goals had stayed the same.

M.A.L.D. was born two months after M.E.N.J. was taken into DCS custody. On the motion of the children's guardian ad litem, M.A.L.D. was taken into DCS custody when mother was discharged from the hospital. The juvenile court found that mother had

not remedied the issues that led to M.E.N.J.'s removal. The court ruled that this necessitated M.A.L.D.'s removal, as well.

Mother continued to reside with her female friend after her children were removed. She brought her then-boyfriend, M.A.L.D.'s father, into her friend's house. However, her boyfriend's drinking ultimately led to mother and her boyfriend being asked to leave. Mother and her then-boyfriend went on to stay with various friends in the Western Heights Housing Project or at the Knoxville Area Rescue Ministry. They also briefly stayed with the girlfriend of her boyfriend's brother. Mother's relationship with that boyfriend later ended. Mother then stayed briefly with another friend in Western Heights.

Mother then met her new and seemingly-current boyfriend, T.R., who has an extensive criminal record involving drugs and violence. Mother also began sleeping on a pile of cardboard boxes behind the Tennessee Theatre. Mother stated in her answer that she is not in a relationship with anyone, and that T.R. only watches her sleep in the alley to protect her. However, the children's case worker testified that in mother's Facebook postings, she described T.R. as her fiancé and the love of her life.

In order to bring mother a bus pass, the children's caseworker met with her in the alley where she was living. Mother told the case worker that her own mother had sent her $250 for a hotel room for a week. Mother then returned to the alley, where she was arrested for failing to pay child support. She told the case worker that, since her release, "we" have been living with another couple in a tent. The case worker assumed that the "we" was referring to herself and T.R.

The children's case worker has made repeated attempts to find mother suitable housing. She suggested to mother that she go to Knoxville Area Rescue Ministries, where she could receive services and enter their transitional living program. Mother told the case worker she did not want to go to KARM for fear of getting scabies, but she allegedly told the children's foster mother that she would not go to KARM because T.R. was not allowed to stay with her there. The children's case worker offered to assist mother in filling out housing applications, and she told mother that she would drive her to submit them. Mother, however, declined the case worker's help, stating that she could take care of any applications herself and that she was only interested in moving into Western Heights. Despite being homeless at the time, mother would not consider any other location.

Mother completed a mental health assessment and began attending the recommended individual therapy and case management. However, she stopped attending a few months later and also stopped working with her case manager a month later. She

claimed that she had been taken off her psychotropic medication due to her pregnancy. However, when confronted with her medical records, mother admitted that she had not returned for her psychiatric appointments and had voluntarily stopped taking her medication. She completed another medical evaluation, but again failed to return. A few months later, mother told the children's case worker that she could not access therapy or medication because she no longer had insurance. However, when the case worker made mother an appointment for an updated mental health assessment at no cost to her, she had great difficulty locating mother, who missed the scheduled appointments. Mother eventually completed the evaluation a few months later, which recommended individual therapy and medication. Mother has attended a few therapy appointments since then, but has not begun taking any medication.

Mother has not failed any drug screenings since her children were taken into DCS custody. However, most of her significant others have had serious alcohol or drug abuse issues. Mother acknowledged that her previous boyfriend's substance abuse issues were a barrier to the return of her children. Despite this knowledge, mother chose to subsequently become involved with T.R., an individual with substance abuse and violence issues.

DCS filed a petition to terminate mother's parental rights as to both children, asserting that it had been six months since the children were taken from mother's custody, but that (1) mother's conditions that led to the children's removal still persist; (2) mother has failed to substantially comply with the permanency plan; and (3) mother failed to manifest an ability and willingness to personally assume custody or financial responsibility of the children. DCS also asserted that termination of mother's parental rights is in the children's best interest. It was the desire of DCS to place the children for adoption. The children's case worker testified that the children are "doing very well" in the prospective adoptive home and that they have remained in the same home since they entered foster care.

Mother responded with a handwritten answer, asserting that she was attempting to get an apartment and is working to pay child support. She argues that she is not in a relationship and has done everything requested of her by the case worker. She also asserted that she asked her case worker for help with "fixing" her identification, and that she began working after it was fixed. She argued that T.R. protects her in the alley and that he has helped her "more than any of [her] friends have." Mother states in her answer that

> [m]y children are better off with me than anyone else. The
> foster mom is good but she is not their birth mom! No one is

4

going to love my kids like I do. My children belong with me[,] no one else. I am doing my hardest to get them back!

The children's case worker testified that mother had visited the children and that the visits overall went well.

The trial court found clear and convincing evidence supporting the termination of mother's rights based on DCS's three asserted grounds. The trial court also found, by clear and convincing evidence, that termination of mother's rights was in the best interest of the children. Mother appeals.

## II.

Mother raises the following issues on appeal as taken verbatim from her brief:

Did the trial court err by terminating the Respondent's parental rights on the basis of persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3) where the Department of Children's Services failed to introduce sufficient evidence into the record to prove persistent conditions as a ground for termination by clear and convincing evidence?

Did the trial court err by terminating the Respondent's parental rights on the basis of substantial noncompliance with the terms of the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) where the Department of Children's Services failed to introduce sufficient evidence into the record to prove substantial noncompliance as a ground for termination by clear and convincing evidence?

Did the trial court err by terminating the Respondent's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14) where the Department of Children's Services failed to introduce sufficient evidence into the record to prove Tenn. Code Ann. § 36-1-113(g)(14) as a ground for termination by clear and convincing evidence?

Did the trial court err by finding by clear and convincing evidence that it was in the best interest of the minor child to terminate the Respondent's parental rights?

5

(Paragraph numbering in original omitted.)

### III.

A parent has a fundamental right, based upon the federal and state constitutions, to the care, custody, and control of his/her children. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174–75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court is tasked with conducting a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525–26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether

termination is in the child's best interest [ ], regardless of whether the parent challenges these findings on appeal.")

The Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523–24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

### A.

Tenn. Code Ann. § 36-1-113(g) provides a cumulative, non-exhaustive listing of the potential grounds upon which termination of parental rights may be based. Tenn. Code Ann. § 36-1-113(g)(3) allows a court to terminate parental rights when

> [t]he child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents . . . , still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

With respect to subsection (g)(3) of § 36-1-113, the trial court found clear and convincing evidence to support this ground of termination. The court observed as follows:

> the children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of Respondent; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to Respondent in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

Mother argues on appeal the only condition which led to removal of her children that still existed at the time of trial was mother's lack of appropriate housing. She asserts that she has addressed her mental health issues by attending therapy regularly. She notes that she has obtained a legal source of income. Mother argues that there is no evidence beyond mere speculation that she will not be able to remedy her lack of appropriate housing at an early date. Mother also asserts that the continuation of her relationship with the children does not greatly diminish their chances of early integration into a safe, stable and permanent home, since the only remaining stumbling block to reunification with her children is a lack of stable housing.

There is clear and convincing evidence in the record contradicting mother's arguments. The children have been in the care of their foster parents for well over one year. The conditions that led to the children's removal or other conditions that in all reasonable probability would cause the children to be subjected to further abuse or neglect and prevent the children's safe return still also persist. Since leaving her friend's home – which was found by the court to be inappropriate housing – mother has resided (1) with other friends, (2) in an alley in downtown Knoxville, (3) in a hotel for a week, (4) in jail, and most recently, (5) in a tent, presumably with T.R., who has an extensive criminal record involving drugs and violence. The children's case worker has attempted on multiple occasions to assist mother in finding appropriate housing. The case worker urged her to go to Knoxville Areas Rescue Ministries. Mother, however, has rejected the case worker's help, apparently because T.R. could not reside with her at KARM. Mother had begun attending her mental therapy appointments, but had not begun medication to help with her bipolar disorder.

The record as described above demonstrates that there is little likelihood that mother will remedy her housing situation or end her associations with individuals who have histories of violence and drug use at an early date in the near future. The children have both resided in the same foster home, where M.A.L.D. has resided since his birth. Their foster parents have expressed interest in adopting the children. Allowing the parent/child relationship to continue threatens the children's chances of early integration into a safe, stable, and permanent home. As a result, we hold that the evidence does not preponderate against the trial court's judgment with respect to persistence of conditions. Furthermore, we hold, as a matter of law, that there is clear and convincing evidence supporting the trial court's judgment on this point.

## B.

Tenn. Code Ann. § 36-1-113(g)(2) allows a court to terminate a parent's rights when the parent has failed to substantially comply with the statement of responsibilities in a permanency plan. The Supreme Court has stated that, "[i]n the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). "A trial court must [also] find that the requirements of a permanency plan are 'reasonable and related to remedying the conditions which necessitate foster care placement.' " *Id.* at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)).

The trial court found that mother

failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement. She has not followed anything through to the end. She did an alcohol and drug assessment and a mental health assessment and then stopped participating in treatment; the Department of Children's Services arranged for her to receive updated assessments and, once again, she failed to complete treatment.

Mother argues that she had substantially completed almost all of the reasonable requirements set out in the permanency plan. Mother asserts that, by the time of trial, she had obtained a mental health assessment and began attending individual therapy sessions regularly; visited with her children in an appropriate manner; and submitted to and passed all drug screens. Mother also argues that DCS failed to present evidence in the record demonstrating that she did not complete any classes requested of her by DCS or that she was in need of medication to manage her mental health. Mother acknowledged that she lacked safe and appropriate housing at the time of trial, but argues that she was in the process of obtaining housing at the time of trial and that she has a high likelihood of success in doing so in the near future, given her substantial progress on the other tasks set forth in the permanency plan.

Despite mother's protestations, the record indicates that mother was not in substantial compliance with the permanency plan. Mother's permanency plan required that she obtain and maintain safe, clean, stable housing free from environmental hazards, domestic violence, drug abuse, illegal activity, and other risks to the child. Not only has mother failed to obtain such housing, she has actively refused assistance from the children's case worker to begin the process of applying for and obtaining such housing. This refusal likely arises from her desire to remain with T.R., who, as previously stated, has an extensive record of drug abuse and criminal activity.

Mother argues that she has substantially complied with her plan requirements *as of the time of trial*. This is not the issue. The issue on grounds is whether she had substantially complied *prior to the filing* of the petition to terminate. She clearly had not.

The evidence does not preponderate against the trial court's findings with respect to compliance with the permanency plan. Furthermore, we hold, as a matter of law, that there is clear and convincing evidence to support the trial court's determination on this issue.

## C.

Tenn. Code Ann. § 36-1-113(g)(14) allows a court to terminate a parent's rights when

> [a] legal parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Mother argues that, *as of the time of trial*, she had remedied almost all of the conditions that initially led to the children's removal. She asserted that she has been attending therapy regularly and has obtained a legal source of income. She also argues that there is no evidence beyond speculation that she will not obtain appropriate housing at an early date, which is, according to her, the "last stumbling block remaining in [her] path toward[s] reunification." Additionally, mother asserts that the parent under (g)(14) must fail to manifest an ability *and* willingness to assume custody or financial responsibility. She argues that there is no evidence to support that she lacks a willingness to assume custody or financial responsibility, since she has been working to pay her child support.

We would again point out that the issue is not what the situation was *at time of trial* but rather what the record shows *at the time the petition was filed*. The record demonstrates that the elements of subsection (g)(14) have been established in this case. Mother has failed to manifest an ability to personally assume legal and physical custody or financial responsibility of the children, as she was living in a tent with several other individuals at the time of trial and had only recently begun making child support payments. She has also failed to manifest a willingness to do so, considering that she has refused multiple attempts from her children's case worker to help her apply for transitional or low-income housing. Additionally, although mother does seem to love her children and desire to see them during visits, placing the children in her custody would pose a risk of substantial harm to the physical or psychological welfare of the children for several reasons. The children are very young and have lived with their foster parents for over a year now. Their foster parents have provided a clean, safe, stable, loving, and supportive environment for the children. Removing the children from their current home and placing them back in mother's care would expose them to a high risk of mother either failing to obtain or again losing appropriate housing or associating with individuals that would potentially expose the children to drug use, domestic violence, or other illegal activity. We hold as a matter of law that the evidence does not preponderate against the

11

trial court's finding of clear and convincing evidence that mother failed to manifest an ability and willingness to assume custody or responsibility of her children and that placing the children in her care would pose a risk of substantial harm to the physical or psychological welfare of the children.

**V.**

Based on our finding that statutory grounds warrant terminating mother's parental rights, we now focus on whether termination of her rights is in the best interest of the children. When considering the issue of "best interest," we are guided by the following statutory factors set forth in Tenn. Code Ann. § 36-1-113(i), which provides that

> [i]n determining whether termination of parental . . . rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . ;
>
> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent . . . has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest[] must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

The trial court found that mother

> has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. She has maintained regular visitation with the children and she [does] not use drugs; the Court gives her that. But she has no home for the children. It is not just that she is without a healthy and safe physical environment to offer the children, she is not in a position to obtain one. These children are doing great. A change of caretakers and physical environment is likely to have a detrimental effect on their emotional and psychological condition. [M.A.L.D.] is in the only home he has ever known. [Mother] has shown neglect toward these

13

children. It is apparent that [mother's] mental and/or emotional status would be detrimental to the children or prevent [mother] from effectively providing safe and stable care and supervision for the children. And [mother] has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. [§] 36-5-101. She had a job for two weeks but was fired for not showing up. She cannot support herself[,] let alone provide for her children.

\* \* \*

The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

The children are entitled to a safe, secure and loving home. They are now thriving and have the opportunity to achieve permanency through adoption. They deserve to know where they will lay their heads at night. They should not have to rely on somebody who is unreliable, to depend on somebody who is undependable.

It is, therefore, in the best interest of [M.E.N.J.] and [M.A.L.D.] and the public that all of [mother's] parental rights to these children be terminated and the complete custody, control, and full guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

(Numbering in original omitted.)

Mother argues that the preponderance of these facts weigh in her favor. She asserts that she has regularly visited with her children; that the oldest child lived the majority of his life in her care; and that there is no evidence that the children are not closely bonded with her. She also argues that she has made significant strides toward addressing DCS's concerns by obtaining a mental health assessment, beginning to attend therapy on a regular basis, visiting consistently with her children, and passing her drug screens. Mother further asserts that she has never abused or neglected the children and that their removal was based solely on her mental health and housing issues as stated by the juvenile court at the time of the children's removal. She also argues that she is now

14

paying her child support and that there is no testimony from a mental health professional asserting that the children would be harmed emotionally, psychologically, or medically by entering her care. Finally, mother asserts that, given her progress in other areas, it is reasonable to assume that she will obtain safe and appropriate housing in the near future.

However, the factors in Tenn. Code Ann. § 36-1-113(i) indicate that it is in the children's best interest that mother's rights be terminated. Mother has not made such an adjustment in her circumstances, conduct, or conditions as to make it safe or in the children's best interest to be in her home, as she has failed to locate or attempt to locate safe, clean housing for herself and the children and still associates with inappropriate individuals. Mother has also failed to effect a lasting adjustment after reasonable efforts by available social services agencies. She has not made a lasting adjustment to her circumstances and those of the children. She does not have appropriate housing; she does not regularly attend mental health sessions, and she has not provided an appropriate environment for the children. Mother has maintained regular visitation and contact with the children, and could very reasonably have a meaningful relationship with them, even though they have not lived with her for over a year. However, the change of caretakers and physical environment would likely detrimentally impact the children's emotional, psychological, and medical condition, considering how long they have lived with their foster family and how successfully they have thrived in the foster home. Mother never showed brutality, abuse, or neglect to the children outside of having inappropriate housing, but she continues to associate with individuals like T.R., who has a record indicating that he would expose the children to such conduct. The physical environment of mother's home is not healthy and safe, as mother currently does not reside in a house.

This Court recognizes mother's efforts in obtaining a job and sympathizes with her very difficult situation. Mother obviously cares about her children based on her efforts at the trial level and in this appeal, as well as her recent steps toward seeking mental health treatment and paying her child support. The issue, however, is what is in the best interest of the children. We hold that the evidence does not preponderate against the trial court's finding that termination is in the best interest of the children. Furthermore, we hold, as a matter of law, that there is clear and convincing evidence to support the trial court's best interest determination.

## VI.

The judgment of the trial court is affirmed. Costs of appeal are assessed to the appellant, M.L.D.N. The case is remanded to the trial court for enforcement of that

court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE